Filed 7/9/13  London Finance Group v. Amstem Corp. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| LONDON FINANCE GROUP, LTD., Plaintiff and Respondent, v. AMSTEM CORPORATION, Defendant and Appellant. | B241811 (Los Angeles County Super. Ct. No. BC 459101) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Willaim F. Fahey, Judge.  Reversed and remanded.

Greenberg Traurig, Karin L. Bohmholdt, Denise M. Mayo and Alan A. Greenberg for Defendant and Appellant.

Corporate Legal Services and Mark J. Leonardo for Plaintiff and Respondent.

\* \* \* \* \* \*

Defendant Amstem Corporation (Amstem) appeals from the default judgment for $1,436,766 against it. Amstem argues we must reverse the default judgment because (1) plaintiff London Finance Group, Ltd. (London Finance) did not sufficiently plead one cause of action and did not establish a prima facie case of another; and (2) the damages award was not supported by substantial evidence. We agree that London Finance did not make a prima facie case for its breach of contract cause of action and did not support the damages award with sufficient evidence. These defects do not affect the underlying default of Amstem, however. We reverse and remand for a new default prove-up proceeding.

## FACTS AND PROCEDURE

London Finance's complaint against Amstem alleged causes of action for negligent misrepresentation and breach of contract. London Finance and Amstem entered into an agreement "as of" September 20, 2010, in which London Finance agreed to provide consulting services to Amstem. The consulting agreement was effective as of October 1, 2010. The consulting period commenced on October 1, 2010, and was to terminate no earlier than October 1, 2011, except if Amstem reasonably determined London Finance had not performed its duties and was dissatisfied with its performance. As compensation, Amstem was to give London Finance (1) a retainer fee of $20,000 per month; (2) on an unspecified date, restricted shares of Amstem common stock equal to 5 percent of the issued and outstanding common stock; (3) reasonable expenses incurred by London Finance during the consulting period; (4) 10 percent of the consideration paid for any acquisition or sale by Amstem resulting from London Finance's consulting services; and (5) a warrant to purchase up to 5 percent of the issued and outstanding Amstem common stock. The warrant would allow London Finance to purchase Amstem common stock at the lower of (1) 50 percent of the average closing bid price of the stock for the 20 preceding trading days or (2) $0.05 per share. The warrant would vest on April 2, 2011, and London Finance could exercise it on or after that date. London Finance attached the consulting agreement to its complaint, though not in its entirety. Pages were missing from the agreement, and at least one exhibit to the agreement -- the form for the warrant

2

-- was absent. London Finance never presented a copy of the warrant form exhibit to the trial court.

The complaint alleged London Finance entered into the consulting agreement based on negligent misrepresentations by Amstem. Namely, Amstem allegedly represented it had merged with its Korean parent company, the regulatory authorities in Korea and the shareholders had approved the merger, and everything necessary to otherwise complete the transaction had been completed. Amstem also allegedly represented in their SEC[1] filings that the merger had been completed, and it directed London Finance to review those filings. After signing the consulting agreement, London Finance allegedly learned Amstem's representations about the merger were not true. London Finance alleged it had been damaged "in the sum equal to the benefits that [it] would have received in the Consulting Agreement had the representations originally made by defendants . . . been true." That sum allegedly exceeded $2 million. The breach of contract cause of action alleged Amstem had breached by failing to pay London Finance any sums whatsoever other than an initial $20,000 payment. London Finance alleged it had "performed all conditions, covenants, and promises required by it on its part to be performed according to the terms and conditions of the Consulting Agreement." The prayer for relief sought damages of $2 million or according to proof.

Amstem filed an answer to the complaint. The court afterward granted its attorneys' motion to be relieved as counsel and set for hearing an order to show cause (OSC) regarding corporate representation. The court also struck Amstem's answer. On the date of the OSC hearing, the court entered default against Amstem.

London Finance's summary of the case for the default prove-up stated it was seeking damages and a judgment in the amount of $1,436,371. It argued the elements of its causes of action were established in the declaration of Ari Kaplan, its president. Kaplan's declaration stated London Finance reasonably relied on Amstem's misrepresentations regarding the merger with its Korean parent company, London

---

[1] Securities and Exchange Commission.

3

Finance was harmed by these misrepresentations, and London Finance's reliance was a substantial factor in causing its harm.  He also stated London Finance had performed as required under the consulting agreement.  Kaplan calculated London Finance's $1,436,371 in damages as follows.

- The unpaid retainer fee of $20,000 for 11 months totaled $220,000.
- Five percent of the outstanding Amstem stock totaled $810,914.  He stated 180,203,188 shares were outstanding, and 5 percent of those shares at $0.09 each amounted to $810,914.  Nine cents was the closing price of the shares on September 20, 2010, the date as of which the parties entered into the consulting agreement.
- The equity value of the warrant to purchase 5 percent of Amstem stock totaled $405,457.  He again used 180,203,188 for the total outstanding shares, and he used a per share price of $0.045 (50 percent of the $0.09 closing price on September 20, 2010).

London Finance submitted the declaration of a stock broker, Darren Goodrich, who stated the price of Amstem stock on September 20, 2010, was $0.09 per share.  The court entered default judgment for London Finance in the requested amount of $1,436,371, plus another $395 in costs.  Amstem timely appealed.

## DISCUSSION

"The court's role in the process of entering a default judgment is a serious, substantive, and often complicated one, and it must be treated as such."  (*Kim v. Westmoore Partners, Inc.* (2011) 201 Cal.App.4th 267, 272-273.)  "[I]t is the duty of the court to act as gatekeeper, ensuring that only the appropriate claims get through."  (*Heidary v. Yadollahi* (2002) 99 Cal.App.4th 857, 868.)  In a default prove-up proceeding, "[t]he court shall hear the evidence offered by the plaintiff, and shall render judgment in the plaintiff's favor for that relief, not exceeding the amount stated in the complaint . . . as appears by the evidence to be just."  (Code Civ. Proc., § 585, subd.

4

(b).)[2]  In this case, the court entered default judgment based on declarations from London Finance's witnesses in lieu of live testimony.  This is permitted under section 585, subdivision (d) and is the preferred procedure under rule 3.201 of the Local Rules of Los Angeles County Superior Court.

A default judgment "confesses" material facts alleged by the plaintiff -- that is, """"the defendant's failure to answer has the same effect as an express admission of *the matters well pleaded in the complaint.*"'"  [Citation.]  The 'well-pleaded allegations' of a complaint refer to """"all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law.""""  [Citations.]"  (*Kim v. Westmoore Partners, Inc.*, *supra*, 201 Cal.App.4th at p. 281.)  On appeal, we may consider an objection that the complaint fails to state facts sufficient to constitute a cause of action.  (*Id.* at p. 282.)  If the well-pleaded allegations of the complaint do not state a proper cause of action, the default judgment will not stand.  (*Ibid.*; *Taliaferro v. Davis* (1963) 216 Cal.App.2d 398, 409.)  We independently review whether the complaint states a proper cause of action.  (*Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 515.)

Regarding the negligent misrepresentation cause of action, London Finance alleged its damages consisted of the benefits it would have received under the consulting agreement, had the misrepresentations regarding Amstem's merger with the parent company been true.  Amstem first contends London Finance did not state a valid cause of action for negligent misrepresentation because its "benefit of the bargain" theory of damages is improper.

Two of the essential elements of negligent misrepresentation are justifiable reliance on a misrepresentation and resulting damage.  (*Apollo Capital Fund LLC v. Roth Capital Partners, LLC* (2007) 158 Cal.App.4th 226, 243.)  Generally, the proper measure of damages for negligent misrepresentation is the plaintiff's "out-of-pocket" losses, not the benefit of the bargain measure.  (*Fragale v. Faulkner* (2003) 110 Cal.App.4th 229, 236; *Christiansen v. Roddy* (1986) 186 Cal.App.3d 780, 790.)  "The benefit-of-the-

---

[2]  Further undesignated statutory references are to the Code of Civil Procedure.

5

bargain measure places a defrauded plaintiff in the position he [or she] would have enjoyed had the false representation been true." (*Fragale v. Faulkner*, *supra*, at p. 236.) By contrast, "[t]he out-of-pocket measure restores a plaintiff to the financial position he [or she] enjoyed prior to the fraudulent transaction, awarding the difference in actual value between what the plaintiff gave and what he [or she] received." (*Ibid*.) London Finance did not plead or proffer any evidence of out-of-pocket losses in the default prove-up. Its evidence related to what it should have received under the contract -- the unpaid retainer fee, the value of the shares of Amstem stock, and the value of the stock warrant -- but not any money or property it "gave" to Amstem, and thereby lost, when it entered into the consulting agreement.

Assuming London Finance failed to properly plead damages for negligent misrepresentation, this was not fatal to *any* recovery of damages. London Finance also alleged and sought damages for breach of contract. Under section 580, the court may award damages in the amount demanded in the complaint, and it should grant the "relief consistent with the case made by the complaint and embraced within the issue." (§ 580, subd. (a).) "The primary purpose of this section is to insure that defendants in cases which involve a default judgment have adequate notice of the judgments that may be taken against them." (*Becker v. S.P.V. Construction Co.* (1980) 27 Cal.3d 489, 493.) Both the allegations in the body of the complaint and the prayer for relief may serve to give notice to defendants of the specific amount of damages sought. (*Greenup v. Rodman* (1986) 42 Cal.3d 822, 830; *Barragan v. Banco BCH* (1986) 188 Cal.App.3d 283, 305.) These demands for relief set a ceiling on the amount the court may award. (*Barragan v. Banco BCH, supra*, at p. 305.) Here, the prayer for relief stated London Finance was seeking $2 million in damages, which was more than the court awarded. The breach of contract cause of action incorporated the paragraph from the negligent misrepresentation cause of action alleging damages in the amount London Finance would have received under the consulting agreement. And the breach of contract cause of action alleged Amstem failed to pay any sum under the agreement except the initial $20,000 retainer, while the agreement (setting forth the consideration to be paid to

London Finance) was attached to the complaint and incorporated by reference.  The complaint thus gave Amstem sufficient notice of its potential liability for breach of contract, and the judgment did not award damages above that ceiling.

Still, we must examine whether $1.4 million in damages for breach of contract was supported.  Amstem does *not* allege that a benefit of the bargain theory is inappropriate to remedy a breach of contract.  Such a theory is entirely appropriate.  Contract damages are generally described "as the benefit of the bargain that full performance would have brought" and attempt to place the plaintiff in the same position he or she would have been, had the contract been performed.  (*New West Charter Middle School v. Los Angeles Unified School Dist.* (2010) 187 Cal.App.4th 831, 844.)  Instead, Amstem argues London Finance failed to establish a prima facie case for breach of contract.

In default prove-up proceedings, no proof is required of matters admitted by the well-pleaded allegations of the complaint.  (*Scognamillo v. Herrick* (2003) 106 Cal.App.4th 1139, 1150.)  But as to matters not well-pleaded, this rule does not apply.  (*Vasey v. California Dance Co.* (1977) 70 Cal.App.3d 742, 749.)  Plaintiffs in default prove-up proceedings must establish a prima facie case of matters not admitted by the complaint.  (*Johnson v. Stanhiser* (1999) 72 Cal.App.4th 357, 361-362, 364-365.)  On appeal, we review whether substantial evidence supports the default judgment.  (*Scognamillo v. Herrick*, *supra*, at p. 1150; *Ostling v. Loring* (1994) 27 Cal.App.4th 1731, 1746.)

One of the essential elements of breach of contract is the plaintiff's performance under the contract or excuse for nonperformance.  (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.)  Amstem contends it did not admit performance because the element was not well-pleaded in the complaint, and furthermore, London Finance did not make a prima facie showing of performance.  We agree with Amstem.

Mere conclusions of fact or law are not well-pleaded allegations for purposes of default proceedings.  (*Kim v. Westmoore Partners, Inc.*, *supra*, 201 Cal.App.4th at p. 281.)  London Finance alleged that it had "performed all conditions, covenants, and

7

promises required by it on its part to be performed according to the terms and conditions of the Consulting Agreement." Section 457 permits plaintiffs in a breach of contract action to plead performance generally, but beyond the initial pleading stage, still requires facts showing performance when the defendant controverts the general allegation. The general allegation that a plaintiff has performed all the conditions of the agreement, "while specifically authorized by the code, is none the less the statement of a conclusion." (*Willis v. Page* (1937) 19 Cal.App.2d 508, 512; see also *Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1390 [allegations that conditions precedent "'had been met and satisfied'" were "simply general conclusions"].) As a mere conclusion of fact rather than a well-pleaded allegation, Amstem did not simply admit the allegation by default.

London Finance was therefore required to establish performance with prima facie evidence. Its "evidence" consisted solely of the Kaplan declaration in which he repeated verbatim the conclusory allegation of performance in the complaint. A conclusion of performance is not evidence establishing performance. Performance is the ultimate fact, and particular, probative facts are required to establish it. (*Central Valley General Hospital v. Smith* (2008) 162 Cal.App.4th 501, 513 ["the term 'ultimate fact' generally refers to a core fact, such as an essential element of a claim," and is distinguished from an evidentiary fact].) The consulting agreement required London Finance to do a number of things. By way of example, it was to use its "reasonable and best efforts" to assist Amstem with "identifying, analyzing, structuring and/or negotiating business sales and/or acquisitions" and with reorganizing Amstem's capital structure. London Finance failed to present substantial evidence it had performed any of these obligations under the consulting agreement. Without this evidence, it was not entitled to damages.

Amstem next contends that, even if London Finance had proffered the necessary evidence of performance, there was not substantial evidence to support over $1.4 million in damages. We agree, except as to the $220,000 attributable to the unpaid monthly retainer fee. The consulting agreement provided for a term of at least one year and a monthly retainer fee of $20,000. Kaplan declared that London Finance received the

8

retainer fee for just one month. Assuming London Finance can establish prima facie evidence of performance, substantial evidence supported the damages for the unpaid retainer fee.

The damages attributable to the stock and warrant are a different matter, however. London Finance grossly oversimplified the calculation of these damages and did not establish the amounts with sufficient evidence. The calculation of these damages involved numerous moving parts and should have been rather complex. The consulting agreement stated Amstem was to grant London Finance restricted shares of stock equal to 5 percent of Amstem's outstanding stock. The agreement does not specify when Amstem would issue these shares. London Finance valued them at $0.09 each, the price of the shares on September 20, 2010. It did not provide any evidence or law establishing this was the appropriate date to value the shares, other than a notation that the parties "entered into" the agreement on September 20. The agreement did state the parties entered into it on that date, but the agreement also said it became effective on October 1, 2010, Kaplan's declaration stated the parties entered into the agreement on or about October 1, and Amstem signed the agreement on October 6.

There was no reason to suppose September 20 was the appropriate date to value the shares as opposed to October 1, October 6, or some other date.[3] This is especially true because London Finance was to receive *restricted* shares of stock. London Finance did not offer any evidence of what restrictions were placed on the shares. But restricted securities are typically subject to a minimum holding period ranging from six months to one year before the holder may resell them. (17 C.F.R. § 230.144, subd. (d)(1); *Chessen v. American Registrar and Transfer Co.* (D.Minn. 1998) 8 F.Supp.2d 1161, 1162, fn. 3.) London Finance's calculation assumed without support it could have resold the restricted shares immediately upon issuance on September 20, 2010. Moreover, the number of outstanding shares used to calculate the 5 percent due to London Finance is unsupported.

---

[3]     A print out from Google Finance attached to the stock broker's declaration shows the share prices of Amstem stock from September 13 to October 22, 2010. The price on September 20, $0.09 per share, was the high for that period.

Kaplan's declaration states "there was a total of 180,203,188 shares of stock." He does not explain how he personally came by this knowledge of Amstem's stock or otherwise offer a foundation for this number. He also does not explain what date was used to determine the number of outstanding shares. We can only assume September 20 was used, but again, this assumes without justification that September 20 was indeed the appropriate date.

London Finance's valuation of the warrant also suffered from a number of defects. Amstem was to give London Finance a warrant to purchase up to another 5 percent of outstanding Amstem stock. The purchase price was to be the lower of two options -- 50 percent of the stock's average closing price "for the twenty trading days prior to the date hereof," or $0.05 per share. It is unclear what the agreement meant by "the date hereof," whether that was the date the parties entered into the agreement (September 20), the effective date of the agreement (October 1), or some other date. It is also unclear what date the parties should have used to determine the number of outstanding shares. London Finance used the September 20, 2010 price again to value the shares under the warrant, and specifically 50 percent of the share price on that date. Even if that were the appropriate date, London Finance missed significant nuances in the calculation. The warrant purchase price was supposed to use the *average closing price for the 20 prior trading days*, not simply the closing price on one day. London Finance did not offer evidence of the average price for the 20 days preceding September 20.

Additionally, the warrant would not vest and London Finance could not exercise it until April 2, 2011. If London Finance could not actually purchase the shares until April 2, 2011, the earliest it could resell them would also be April 2, 2011. The value of the warrant should account for this and the fact that the warrant involves some out-of-pocket cost. Arguably, the value should be the difference between the price London Finance would have paid for the shares, and the price for which it could have resold the shares on April 2, 2011 (or some date thereafter). London Finance completely ignores the fact that a warrant to purchase is not the same thing as a straightforward grant of shares. It simply values 5 percent of the shares at 50 percent of the September 20, 2010

10

price, as if a warrant to purchase and a grant were identical. The warrant was an agreement to let London Finance *purchase* discounted shares at a later date, not a straight grant of shares.

Finally, though the consulting agreement stated the form for the warrant was attached, the warrant form never appeared in any version of the agreement London Finance submitted to the court. We thus cannot say whether the form included any additional terms that would be material to the valuation, but it may have. To the extent it did, London Finance should have proffered the warrant form.

\*     \*     \*

In sum, substantial evidence did not support the conclusion London Finance performed its obligations under the consulting agreement and was therefore entitled to damages. Moreover, the amount of damages awarded under the judgment was not supported by substantial evidence. We must reverse the default judgment. This does not affect the underlying default, however, and "simply returns the defendant to the default status quo ante." (*Ostling v. Loring*, *supra*, 27 Cal.App.4th at p. 1743.) The appropriate disposition in this case is to reverse and remand for London Finance to participate in a second default prove-up proceeding. (*Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc.* (1984) 155 Cal.App.3d 381, 386-387 ["[W]hen further proceedings are necessary following reversal of a default judgment because the damages are determined to be excessive as a matter of law, . . . those further proceedings only mean the plaintiff must participate in a second judgment hearing."]; *Uva v. Evans* (1978) 83 Cal.App.3d 356, 365 [reversing default judgment because damages award lacked evidentiary support and remanding to "retry the issue of damages"].)

Amstem requests that we permit it to participate in any proceedings on remand because London Finance was not candid with the trial court. But a "defendant cannot participate in a second judgment hearing any more than it can in the first hearing between default and appeal." (*Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc., supra*, 155

11

Cal.App.3d at p. 387.)  Amstem has not convinced us we should carve out an exception to this general rule in its case.[4]

## DISPOSITION

The judgment is reversed.  The trial court is directed to conduct new default prove-up proceedings consistent with the views expressed in this opinion.  Appellant to recover costs on appeal.


FLIER, J.

WE CONCUR:



BIGELOW, P. J.



GRIMES, J.

---

[4]     Amstem also requests that we take judicial notice of two documents:  a grand jury indictment of London Finance executives, including Kaplan, and an Amstem SEC filing stating it terminated one of its executives who then became an executive for London Finance.  A precondition to the taking of judicial notice in either its mandatory or permissive form is that "any matter to be judicially noticed must be relevant to a material issue." (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 422, fn. 2.)  We are not convinced these documents are relevant to a material issue and deny the request for judicial notice.